**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**DOUGLAS HOUSTON**,[1]

                              Plaintiff,

          - v -                                          Civ. No. 9:10-CV-1009
                                                              (NAM/RFT)

**LESTER N. WRIGHT**, *M.D., M.P.H., New York State DOCS,*
*Health Services,* **DOCTOR JOHNSON**, *Clinton Correctional*
*Facility Health Services,* **JOHN DOE**, *Nurse Assistant,*
*Clinton Correctional Facility, Health Services,*

                              Defendants.

**APPEARANCES:**                                          **OF COUNSEL:**

**DOUGLAS HOUSTON**
Plaintiff, *Pro Se*
06-A-2860
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

**HON. ERIC T. SCHNEIDERMAN**                    **BRIAN J. O'DONNELL, ESQ.**
Attorney General of the State of New York          Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

*Pro se* Plaintiff Douglas Houston brings this civil rights action, pursuant to 42 U.S.C. § 1983,

alleging that Defendants (1) were deliberately indifferent to his serious medical needs, and (2)

---

[1] Plaintiff consistently signs his name as "Houston Douglas," however, Plaintiff's name is listed as "Douglas Houston" on the Department of Corrections and Community Supervision ("DOCCS") website, *available at* http://nysdocslookup.doccs ny.gov (last viewed on Aug. 28, 2013, for DIN# 06-A-2860),Court's Case Management/Electronic Case Filing System as well as in all of Defendants' papers. Therefore, we refer to Plaintiff as "Douglas Houston."

subjected him to unconstitutional conditions of confinement. Dkt. No. 14, Am. Compl. Defendants move for Summary Judgment on the grounds that (1) Plaintiff does not have a sufficiently serious injury, (2) Defendants did not act with deliberate indifference, (3) Defendant Wright was not personally involved, (4) there is no evidence to support Plaintiff's claim that the facility was infested with cockroaches, and (5) Plaintiff failed to timely name and serve Defendant John Doe. Dkt. No. 52-14, Defs.' Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 62, Pl.'s Opp'n.[2] For the reasons that follow, we recommend that Defendants' Motion for Summary Judgment be **GRANTED in part and DENIED in part**.

## I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

---

[2] Plaintiff's Opposition consists of a Statement Pursuant to Local Rule 7.1 (hereinafter "Pl.'s 7.1 Statement"), Plaintiff's Affidavit, Memorandum of Law, and several Exhibits. Dkt. No. 62.

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v.*

*Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## II. DISCUSSION

### A. Summary of Facts

Except where noted, the following facts are uncontroverted.

Plaintiff's claims arise out of events that transpired while he was an inmate at Clinton Correctional Facility ("CCF"). *See* Dkt. No. 52-13, Douglas Houston Dep., dated Mar. 6, 2012, at p. 7. There are two medical clinics at CCF, the Main Infirmary Clinic and the Annex Clinic. *Id*. at pp. 10 & 58. Defendant Dr. Lester Wright was the Chief Medical Officer of the New York State Department of Corrections and Community Supervision ("DOCCS"), but is now retired. Dkt. No. 52-3, Vonda Johnson, M.D., Aff., dated Sep. 5, 2012, at ¶ 4. Defendant Dr. Vonda Johnson was the Facility Health Care Services Director at CCF, as well as one of Plaintiff's treating physicians. *Id*. at ¶¶ 1 & 5.

On July 16, 2007, Plaintiff reported to the Annex Clinic complaining of dizziness and blurred vision. Plaintiff's blood pressure (hereinafter "BP") was elevated (198/103) and he had missed his last two doses of Metfornin, a medication he had been taking since 2001 to control his Type II Diabetes. A nurse practitioner then phoned in a prescription for Amlodipine (generic for Norvasc), a blood pressure medication, which was administered to Plaintiff by Defendant John Doe (a.k.a. Paul Harriman),[3] a registered nurse. Plaintiff was instructed to have his blood pressure monitored while he awaited a follow-up visit with his healthcare provider, which was set for the following week. Houston Dep. at pp. 12–13, 21, 26–27, & 29–30; Johnson Aff. at ¶ 9, Ex. 1, Portions of Pl.'s

---

[3] Plaintiff reveals in his Reply Statement Pursuant to Local Rule 7.1 that John Doe is also known as Paul Harriman. *See* Dkt. No 62, Pl.'s 7.1 Statement at ¶ S12.

Medical R. (hereinafter "MR") at p. 12, & Ex. 2, Defs.' Annotated MR (hereinafter "AMR"),[4] at 7/16/07 entry. On July 18, Plaintiff told a nurse practitioner that he was not taking the Norvasc/Amlodipine because he did not think he needed it, and denied having vision problems. Plaintiff was encouraged to take his medication and a request for an ophthalmology consultation was submitted. Johnson Aff. at ¶ 10; MR at pp. 12–13; AMR at 7/18/07 entry. On July 20, a nurse monitored Plaintiff's vital stats. MR at p. 11; AMR at 7/20/07 entry.

On July 23, 2007, Plaintiff was admitted to the Infirmary Clinic complaining of dizziness, blurred vision, and double vision for the past week. Plaintiff's blood pressure was found to be elevated (190/99), an EKG was performed, and he was given Norvasc. MR at pp. 10–11; AMR at 1st & 2nd 7/23/07 entries. On July 24, 2007, Plaintiff saw Defendant Dr. Johnson for the first time. Plaintiff's BP was elevated (179/97), and Dr. Johnson noted that Plaintiff had the following symptoms: "ptosis (a drooping eyelid) on the left side, . . . a slow inward gaze and inward rotation of his eyes on a downward gaze." Johnson Aff. at ¶ 12. Dr. Johnson also noted that Plaintiff had just recently been started on BP medication and should be monitored. Plaintiff met with Dr. Johnson again on July 25. Dr. Johnson noted that Plaintiff's left eye had improved since the day before, but his hypertension was still poorly controlled. Dr. Johnson tentatively diagnosed third nerve palsy as the cause of Plaintiff's ptsosis, increased Plaintiff's dose of Norvasc, and prescribed Glipizide for his Diabetes. *Id.* at ¶¶ 12 & 13; MR at pp. 87–88; AMR at 7/24/07 & 2nd 7/25/07 entries. On July 26, Plaintiff's BP and glucose levels were monitored throughout the day, and he reported that he was

---

[4] Dr. Johnson has annotated certain entries from the AMR which she believes are pertinent to Defendants' Motion, providing a typewritten translation of the handwritten entries in the AMR. Johnson Aff. at ¶ 6 & Ex. 2. The portions of Plaintiff's Ambulatory Health Record are docketed separately at Dkt. No. 52-4, while Dr. Johnsons's annotations are docketed at Dkt. No. 52-5.

experiencing improvement in his left eye.  MR at p. 85; AMR at 7/26/07 entries.  On July 27, Plaintiff was provided with a thirty-day supply of Metformin, Glipizide, and Norvasc to administer himself in his cell, reminded of the importance of taking his medication, and discharged from the Infirmary Clinic.  MR at pp. 8 & 83–84; AMR at 2nd 7/27/07 & 7/28/07 entries; *see also* Houston Dep. at pp. 18–20 (explaining self-carry procedure).  Thereafter, on July 28, 30, 31, and August 1, and 2, Plaintiff's BP and blood sugar were checked by CCF medical personnel.  MR at pp. 7 & 8; AMR at 7/28/07–8/2/07 entries.

On August 7, 2007, Plaintiff told Dr. C. Ferrari, a non-defendant, that he was experiencing an adverse reaction to the BP medication.  Dr. Ferrari's notes from that meeting state "on Norvasc . . . and does not want to increase medication . . . . Claims all his meds are causing 'eye problems.'" MR. at p. 6; AMR at 8/7/07 entry.  On August 10, 2007, Plaintiff had a specialty consultation with an ophthalmologist, who noted that Plaintiff was experiencing weakness in both eyes, ptsosis on both sides, and weakness in his right hand and arm.  The ophthalmologist recommended an emergency neurological consult.  MR at pp. 6 & 29; AMR at 1st 8/10/07 entry.  Plaintiff was then taken to the emergency room at Champlain Valley Physicians Hospital ("CVPH"), where a CT scan of his brain and a blood test were conducted.  Plaintiff was diagnosed with "PROBABLE MYASTHENIA GRAVIS."  Later that evening, Plaintiff was discharged from CVPH and readmitted to the Infirmary Clinic at CCF with an elevated BP (208/108).  Clondine, an additional BP medication, was prescribed, and a neurological consult was recommended.  MR at pp. 6, 69, & 81; AMR at 2nd – 4th 8/10/07 entries.

Despite being cautioned by CCF medical staff, Plaintiff refused to take his BP medications on August 11, 12, and 13, because, *inter alia*, they were "hurting" him.  MR at pp. 69, 70, & 76;

*-6-*

AMR at 8/11/07–8/13/07 entries. On August 14, at the Infirmary Clinic, Dr. Johnson reviewed reports from CVPH and wrote a referral for a consultation with a neurologist. She also "discussed hypertension with [Plaintiff] at length including possible side effects and adverse reactions to medication," decreased Plaintiff's prescription for hydrochlorothiazide, and restarted Plaintiff on Clonidine. Johnson Aff. at ¶ 19; MR at pp. 28, 67, & 71; AMR at 2nd 8/14/07 entry; *see also* Dkt. No. 62, Douglas Houston Aff., dated Nov. 26, 2012, at ¶ 17. Dr. Johnson saw Plaintiff in the Infirmary Clinic on August 15. She noted that Plaintiff's BP "was under better control since he had been taking clonidine and hydrochlorothiazide." Johnson Aff. at ¶ 21; MR at p. 71; AMR at 1st 8/15/07 entry. Dr. Johnson saw Plaintiff again on August 16, when he continued to complain of alternating weakness in his left and right eyelid as well as weakness in his arms. She noted that his hypertension was under "much better control on clonidine and hydrochlorothiazide," and his blood sugar was also under control; she then authorized his discharge to the Annex Clinic. MR at 77; AMR at 2nd 8/16/07 entry.

On August 18, 20, 21, 23, and 24, Plaintiff refused to take his BP medication because, *inter alia*, "[he] read all those side effects from the medication insert and [he has] all of them." MR at pp. 3–5; AMR at 8/18/07–8/24/07 entries. On August 24, Plaintiff fell while trying to get in his wheelchair and was taken to the Annex Clinic complaining of dizziness, muscle weakness, and an inability to sit up or stand. CCF medical staff noted that Plaintiff had a raised area on the back of his head and a superficial laceration; Dr. Johnson was called and she ordered that Plaintiff be taken by ambulance to CVPH's Emergency Room, where his injury was treated. MR at p. 2; AMR at 1st 8/24/07 entry. Plaintiff was later returned to the Infirmary Clinic, and on August 25, 2007, Dr. Johnson ordered that Plaintiff's vital signs be taken every four hours over the course of the day and

then every shift thereafter. She also prescribed Metoprolol and Vasotec for Plaintiff's BP, Metformin for his Diabetes, and scheduled a neurology consultation. MR at p. 63; AMR at 1st 8/25/07 entry. That same day, Plaintiff urinated on his wall and claimed that he could not move; he also refused to take any BP medications stating that "my meds are what's making me sick[,] I need new meds." Dr. Johnson was called and ordered Vasotec be discontinued and Hydrochlorothiazide be started. MR at pp. 14 & 63; AMR at 2nd 8/25/07 entry; Johnson Aff at ¶ 25.

On August 27, Plaintiff continued to complain of muscle weakness and refused to take his medications. MR at p. 64; AMR at 1st and 2nd 8/27/07 entries. That same day Plaintiff was evaluated by a neurologist who recommended that Plaintiff be hospitalized at Albany Medical Center ("AMC") for a work-up. MR at p. 28; AMR at 3rd 8/27/07 entry. Plaintiff also fell while trying to get into his wheelchair and reopened the wound he incurred on August 24; his wound was cleaned and dressed at the Annex Clinic and he was then taken by ambulance to CVPH. MR at p. 2; AMR 4th–5th 8/27/07 entry. On August 28, Plaintiff was transferred to AMC where he had a neurology consultation. MR at p. 23. On or about September 4, 2007, Plaintiff was discharged from AMC, with a primary diagnosis of myasthenia gravis, and a secondary diagnosis of diabetes, hyperlipidemia, and hypertension; a regiment of drugs was prescribed including steroids for treatment of Plaintiff's myasthenia gravis. Dkt. No. 62-1, Pl.'s Opp'n, Ex. A, at pp. 123–24, AMC Discharge Summary.[5] When Dr. Johnson met with Plaintiff on September 6, she noted that he was still complaining of weakness in upper and lower extremities, that he "can stand with the aid of walker and take a few steps but extremely afraid of failing, getting stuck on toilet, w/o being able

---

[5] Defendants note that they were only provided with one page of the two page Discharge Summary. AMR at 9/04/12 entry. However, Plaintiff provided both pages in his Exhibit. *See* Pl.'s Mem. of Law at p. 3.

to get back up, etc." MR at p. 61. Dr. Johnson recommended that he continue on the prescription regimen prescribed by AMC for treatment of myasthenia gravis. On September 10, 2007, per Dr. Johnson's recommendation, Plaintiff was transferred to the Regional Medical Unit at Coxsackie Correctional Facility (hereinafter "Coxsackie RMU"). Johnson Aff. at ¶¶ 26–27; MR at p. 60, & 65; AMR at 9/6/07 entries.

According to Plaintiff, during the three visits he made to the Main Clinic between July 16, and August 27, he was placed in a cockroach infested infirmary, where he was unable to eat for a week[6] because the cockroaches got to his food before he could. Houston Aff. at pp. 57–59.

## B. Eighth Amendment

Construed liberally, Plaintiff's Amended Complaint alleges two Eighth Amendment violations against Defendant Johnson. One for deliberate medical indifference, and one for subjecting Plaintiff to unconstitutional conditions of confinement. Plaintiff claims that Defendant Johnson (1) delayed his medical treatment by ignoring his claims that the BP medication was causing him to experience severe muscle weakness and significant pain for thirty days while she focused her efforts on diagnosing him with myasthenia gravis; and (2) that he was treated in a cockroach infested Infirmary. Am. Compl. at ¶¶ 6 & 7; Houston Dep. at pp. 57–59; *see also* Dkt. No. 62, Pl.'s Mem. of Law at pp. 9–12. For the reasons that follow we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's deliberate indifference claim, and **DENIED** as to Plaintiff's conditions of confinement claim.

---

[6] It is unclear whether Plaintiff was unable to eat for a week straight, or for a total of seven non-consecutive days. *See* Houston Dep. at pp. 57–59; Am. Compl. at ¶¶ 6 & 7.

*i. Medical Claim*

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'" *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The seriousness element is an objective test. To determine whether the deprivation of care is sufficiently serious "entails two inquiries." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citations omitted). First, courts must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is "adequate" where the care provided is a "reasonable" response in light of the "health risk" the inmate faces. *Id.* at pp. 279–280. The second inquiry requires a determination of "whether the inadequacy in medical care is sufficiently serious." *Id.* at p. 280. In cases where medical care is denied, courts focus on the seriousness of the underlying medical condition. *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). Some of the factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir.

2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is at the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one"). Whereas, the "seriousness inquiry is narrower" in cases where "the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment." *Salahuddin v. Goord*, 467 F.3d at 280 (citing *Smith v. Carpenter*, 316 F.3d at 185)). In such cases, courts "focus[] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* In cases of delay the objective requirement requires a finding that the alleged delay in treatment put Plaintiff at a significant risk of harm. *Smith v. Carpenter*, 316 F.3d at 186. Determining whether the delay presents a sufficiently serious risk "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citing *Helling, v. McKinney*, 509 U.S. 25, 32–33 (1993))

The second element, deliberate indifference, is based on a subjective standard. To establish deliberate indifference a plaintiff must demonstrate that the defendant acted with a culpable mental state, such as criminal recklessness. *Wilson v. Seiter*, 501 U.S. 294, 301-03 (1991); *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer*). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious

harm.'"  *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

To begin with, we note that it is unlikely that Plaintiff can satisfy the objective element of an Eighth Amendment delay of medical treatment claim.  The record clearly demonstrates that Plaintiff received extensive medical care, including doctor visits, medication, constant checkups and monitoring by CCF medical staff, diagnostic testing such as blood work and a CT Scan, as well as specialty consultations with a neurologist and an ophthalmologist, and on multiple occasions, emergency medical care at outside hospitals.  *See supra* Part II.A.  Thus, we find that no rational juror could find that the care provided by any of the Defendants was unreasonable.  *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986) ("The Constitution does not command that inmates be given medical attention that judges would wish to have for themselves."); *see also Harrington v. Mid-State Corr. Facility*, 2010 WL 3522520, at *11 (N.D.N.Y. May 21, 2010) (finding that "[r]eferring for specialist care, explaining the specialist's findings, and referring for further diagnostic follow-up are all appropriate treatment actions") (citation omitted); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311-12 (S.D.N.Y. 2001) (collecting cases to support a similar proposition).  Moreover, notwithstanding Plaintiff's conclusory allegations to the contrary, there do not appear to be any significant delays or gaps in Plaintiff's treatment.  As established above, Plaintiff received some sort of care nearly every day.  *See supra* Part II.A.  Thus, it does not appear that any delay in medical treatment occurred, let alone any that put Plaintiff at a serious risk of harm.  *See Smith v. Carpenter*, 316 F.3d at 185–86.  Moreover, even assuming*, arguendo*, that Plaintiff could establish the objective element of a delay of treatment claim, his claim would still fail

*-12-*

because there is simply no evidence of deliberate indifference in the record before us.

Essentially, the only issue in dispute is whether the choice of medication, course of treatment and diagnosis pursued by Dr. Johnson were correct. Plaintiff claims that

> Defendant Doctor [J]ohnson and other medical personels [sic] ignored plaintiff['s] complaint of High Blood Pressure Medications [sic] side effects from Amlodipine-Norvasc, Hydrochlorothiazide, Clonidine, and Glipizide, not only that they ignored plaintiff [complaint] of side effects from these medications, there were never any effort made to look into plaintiff complaint. All their efforts was focus[ed] on getting a diagnosis for a disease name[d] Myasthenia Gravis, while the High Blood Pressure Sulfurmide Medications Hydrochlorothiazide Amlodipine-Norvasc and Glipizide, with the adverse effects of the Alkaline Medication Clonidine Poisoning and Destroying plaintiff['s] body.

Pl.'s Mem. of Law in Opp'n at p. 9.

Whereas, Defendant Johnson states that "in [her] opinion to a reasonable degree of medical certainty, the plaintiff['s] ptosis, vision problems and muscular weakness were not the result of any medications that had been prescribed for him at Clinton Correctional Facility." Johnson Aff. at ¶ 19. Moreover, Defendant Johnson, as well as nearly every other medical professional who treated Plaintiff, believed that these symptoms were caused by a condition called myasthenia gravis. *Compare* Pl.'s 7.1 Statement at ¶ R 35, & Pl.'s Mem. of Law in Opp'n at pp. 2–4 & 9; *with* Johnson Aff. at ¶ 26, & MR at pp. 5, 68, 71, 81. Indeed, Plaintiff has even admitted that not a single medical professional that he spoke with at CCF, CVPH, or AMC indicated that his BP medication was the cause of his symptoms. Houston Dep. at pp. 61–62.

Here, it appears that Plaintiff has mistakenly characterized Dr. Johnson's alleged medical decision to pursue a diagnosis and treatment for myasthenia gravis rather than treat Plaintiff for an allergic or adverse reaction to blood pressure medication, as deliberate indifference. However, regardless of whether Dr. Johnson's course of treatment was correct or not, the dispute over the

*-13-*

propriety of the course of treatment, diagnosis, or medication she chose to pursue is not actionable. It is clear that so long as the treatment provided is "adequate," a disagreement over the appropriate course of treatment does not state a claim under § 1983. *Chance v. Armstrong,* 143 F.3d at 703; *Sonds v. St. Barnabas Hosp. Corr. Health Servs*., 151 F. Supp. 2d at 312 (noting that "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim"). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester Cnty. Dept. of Corr.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (citing *Salahuddin v. Goord*, 467 F.3d at 280). As established *supra*, the near daily checkups Plaintiff received, as well as the facts that multiple diagnostic tests were performed and specialists were consulted, it is clear that Plaintiff's care was patently reasonable. *See Harrington v. Mid-State Corr. Facility*, 2010 WL 3522520, at *11 (N.D.N.Y. May 21, 2010) (finding that "[r]eferring for specialist care, explaining the specialist's findings, and referring for further diagnostic follow-up are all appropriate treatment actions") (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir. 1986)).

Likewise, although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is typically reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition . . . or delayed major surgery[.]" *Freeman v. Stack*, 2000 WL 1459782, at *6 (S.D.N.Y. Sep. 29, 2000) (quoting *Demata v. New York State Corr. Dep't of Health Servs.,* 198 F.3d 233 (2d Cir. 1999); *see also Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir. 2000) (a physician

-14-

who "delay[s] . . . treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference) (citations omitted). Significantly, here, Plaintiff did not need surgery, nor has he alleged that Dr. Johnson delayed his care as a form of punishment.[7] And, although Plaintiff's condition appears to have degenerated quickly, and may have been life threatening (to the extent that hypertension and diabetes are both potentially fatal conditions if left untreated), it is clear from the medical records that his condition was never ignored.

Additionally, Plaintiff's claim is further undermined by the fact that he refused to consistently take the medications prescribed by Defendant Johnson and others (even despite his alleged adverse reaction to the medication). *See, e.g.,* MR at pp. 3–5, 12, 14, 69–70, & 76; AMR at 7/18/07, 8/11/07–8/13/07, & 8/18/07–8/24/07 entries. He cannot on the one hand refuse to take the medication that his doctor prescribes to him, and then on the other sue her because she did not relieve his symptoms to his satisfaction. *See Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir. 1986) (affirming lower court ruling that a prisoner who declines medical treatment cannot establish an Eighth Amendment claim for medical deliberate indifference); *Mendoza v. Schult*, 2011 WL 4592381, at *5 (N.D.N.Y. Sept. 14, 2011) ("Plaintiff, who apparently disagreed with the clinical judgment of the medical staff, effectively took his treatment regimen into his own hands by unilaterally opting to discontinue the prescribed recommendations of health services. . . . [and could not] turn around and sue the medical professional for deliberate indifference whose judgment the

_____

[7] The Court is cognizant of Plaintiff's claim that between August 10 and 13, "medical staff refused to give plaintiff his diabetes medication because plaintiff refused to take [his BP medication]." Dkt. No. 62, Douglas Houston Aff. in Opp'n, dated Nov. 26, 2012, at ¶ 15. However, these allegations do not implicate Defendant Johnson in any way, other than tangentially through her position in the chain of command. Thus, because there is no evidence that Defendant Johnson was personally involved in these alleged denials, such a claim is not actionable against her. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (defendant may not be held liable simply because she holds a high position of authority) (citations omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).

prisoner has questioned and even defied.") (citing *Jones v. Smith*); *Ramos v. Genovese*, 2013 WL 773731, at *13 (N.D.N.Y. Jan. 22, 2013).

Thus, we find that no genuine issue of material fact exists as to whether Defendant Johnson was deliberately indifferent towards Plaintiff's medical needs, and therefore we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to these claims.

## ii. *Conditions of Confinement Claim*

Plaintiff claims that he while in the Infirmary Clinic his room was infested with cockroaches, which got into his food preventing him from eating for a week. Am. Compl. at ¶ 7; *see also* Houston Dep. at pp. 57–59. Defendants argue that this claim should be dismissed because there is no evidence to support such a claim. Defs.' Mem. of Law at p. 1.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege that (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in *Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996)).

In *Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002), the Second Circuit set out in detail the requirements that a plaintiff must prove in order to make out a claim that the conditions of his confinement violated the Eighth Amendment:

> Under the Eighth Amendment, States must not deprive prisoners of their "basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Helling* [*v. McKinney*], 509 U.S. [25,] 32 [1993] (citation and internal quotation marks omitted). Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Id*. at 35. Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary

standards of decency. *Id.* at 35-36; *Rhodes* [*v. Chapman*], 452 U.S. [337,] 347 [2002].

Concerning the "subjective" requirement, the Supreme Court has explained that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.
*Phelps v. Kapnolas*, 308 F.3d at 185-86.

"Even if the conditions of confinement were found to be unreasonable as a matter of law, a plaintiff cannot survive summary judgment unless he can point to 'record evidence creating a genuine dispute' as to the facts regarding Defendants' culpable mental state." *Summerville v. Faciuna*, 2009 WL 2426021, at *9 (W.D.N.Y. Aug. 6, 2009) (quoting *Salahuddin v. Goord*, 467 F.3d at 282).

It is axiomatic that the inability to eat for a period of one week is a deprivation of one of "life's basic necessities." Moreover, the "record evidence" at hand establishes a genuine issue of material fact as to whether Defendant Johnson was deliberately indifferent to Plaintiff's complaints that his room was infested with cockroaches. Essentially, Plaintiff claims that he told Defendant Johnson about the infestation, that another inmate assisted him in writing a greivance,[8] and that nothing was done about it. Houston Dep. at p. 57–59. Defendant Johnson claims that no such complaint was ever made to her, and that there is no evidence of any similar complaint in Plaintiff's medical records. Johnson Aff. at ¶ 28.

Such he-said, she-said, arguments cannot be determined on summary judgment because they

---

[8] During his deposition, Plaintiff was asked if he had filed a grievance about the roach situation, and he replied that he was too weak to write, but that "an inmate helped me, wrote the complaint that's in that file because I could not write. All I could do was sign it." Houston Dep. at p. 58. However, it is unclear whether this complaint was a formal grievance, and if so what "file" Plaintiff was referring to in his statement. However, affording Plaintiff every reasonable inference, we accept his claim that he filed a grievance regarding the roach situation at face value.

require the type of credibility assessment that has been specifically reserved to the trier of fact. *See Scott v. Coughlin*, 344 F.3d at 289. Therefore, we recommend that Defendants' Motion for Summary Judgment be **DENIED** as to this claim.

### C. Personal Involvement

Plaintiff claims that Defendant Dr. Wright, DOCCS Chief Medical Officer, is liable because "he effectively abdicated his general supervisory responsibilities to his subordinates." Am. Compl. at ¶¶ 6–7; *see also* Pl.'s Mem. of Law at pp. 7–8; Houston Dep. at pp. 59–61. Defendants argue that Dr. Wright should be dismissed from this action because Plaintiff has failed to allege that Defendant Wright was personally involved in any wrongdoing. Defs.' Mem. of Law at pp. 10–11. Because we agree with Defendants, we recommend that Defendant Wright be **DISMISSED**.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom

to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

Because we have found no evidence of an Eighth Amendment deliberate medical indifference claim, we need not consider whether Defendant Wright was somehow personally involved in such a violation. *See supra* Part II.B(i). Moreover, Plaintiff has admitted that he has never met nor spoken with Dr. Wright, and that Plaintiff's claim is based entirely on Dr. Wright's position as Chief Medical Officer. Houston Dep. at pp. 8–9. Plaintiff claims that "Doctor Lester N. Wright is responsible for his subordinate['s] operations in the prison" and that "he was so unreasonably isolated after being informed of plaintiff['s] serious medical needs . . . [that] he failed to remedy the wrong of his subordinates, that led to pain suffered by plaintiff from July 16, 2007, through the duration of plaintiff['s] pain and suffering." Pl.'s Mem. of Law at p. 1. Yet, Plaintiff has failed to show how Defendant Wright was aware of Plaintiff's claims that his infirmary room was infested with cockroaches. Plaintiff claims only that Defendant Wright was aware of his "medical problems through complaints and reports." Houston Dep. at pp. 8-9 * 33-34 (explaining that he wrote a letter to the "Superintendent of Administration" but not specifically to Wright). Therefore, because we find no triable issue of material fact exists regarding the personal involvement of Defendant Wright, we recommend that Defendants Motion for Summary Judgment be **GRANTED** as to Plaintiff's

claims against him.

### D. Doe Defendant

Plaintiff alleges that John Doe, a nurse assistant, "improperly diagnosed and dispensed medication to Plaintiff without adequate supervision." Am. Compl. at ¶ 6. Defendants argue that John Doe should be dismissed from this action because Plaintiff has never identified nor served him. Defs.' Mem. of Law at p. 2. Plaintiff argues that this is because the identity of Defendant Doe has been "kept concealed" from him by Defendants. Pl.'s Mem. in Opp'n at p. 2. However, as explained below, a review of the docket reveals that Defendants did indeed reveal the identity of John Doe during discovery.

In a Decision and Order, issued by the Honorable Norman A Mordue, United States District Judge, on May 16, 2011, Plaintiff was ordered to "take reasonable steps through discovery to ascertain the name of defendant 'John Doe - Nurse Assistant.' If plaintiff fails to ascertain his identity so as to permit the timely amendment of the complaint and service of process on this individual, this action will be dismissed as against the unnamed defendant." Dkt. No. 15, Mem. Dec. & Ord., dated May 16, 2011, at p. 2. In an apparent attempt to comply with that order Plaintiff requested, through interrogatories, that Defendants identify the nurse assistant that attended him on July 16, 2007. Dkt. No. 39, Pl.'s Interrog. Req., dated Nov. 30, 2011, at p. 7. On March 26, 2012, Plaintiff filed a Motion to Compel Defendants to answer those interrogatories, Dkt. No. 39, and on May 2, 2012, this Court ordered Defendants to provide the name of John Doe to Plaintiff, or provide Plaintiff with notice that they were unable to do so, Dkt. No. 44, Order at p. 2. Despite the fact that Plaintiff had several communications with this Court in between the issuance of that Order and the time that Plaintiff filed his Response to Defendants' Motion for Summary Judgment, he never re-

raised the issue to the Court. *See* Dkt. Nos. 45, Lt., dated May 3, 2012, 49, Mot. to Appoint Counsel,

50, Lt., dated July 6, 2012, 54, Lt.-Mot., dated Sep. 11, 2012, 56, Mot. to Appoint Counsel, 59, Lt.-

Mot., dated Oct. 18, 2012, 60, Lt.-Mot., dated Oct. 29, 2012, & 61, Lt.-Mot., dated Nov. 13, 2012.

Yet, in his 7.1 Statement, Plaintiff states that

> Plaintiff has never named John Doe . . . who dispensed High Blood Pressure
> Medication to plaintiff on July 16, 2007, because defendants failed to produce[]
> requested photograph of the medical staffs that work on July 16, 2007 in the Annex
> Clinic for a positive identification, therefore plaintiff can only name[] the medical
> staff produced to plaintiff by defendant through Discovery Production of Documents
> Paul Harriman–aka–John Doe.

Pl.'s 7.1 Statement at ¶ S 12.

Further review of Defendant's Exhibits reveal that Paul Harriman was indeed the nurse that attended

Plaintiff on July 16, 2007. *See infra* Part II.A.; *see also* MR at p. 12; AMR at 7/16/07 entry. Thus,

it would appear that Defendants complied with this Court's Order directing them to identify the John

Doe. *Ergo*, any fault for the failure to timely name and serve Defendant Doe lies with Plaintiff.

Under FED. R. CIV. P. 4(c)(1) and 4(m), the plaintiff is responsible for service of the

summons and complaint for each defendant within 120 days of the filing of the complaint.[9] Failure

to properly serve any defendant in accordance with the Federal Rules will result in the court, upon

motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.* at

4(m). Here, Plaintiff had 120-days from March 28, 2011 – the day he filed his Amended Complaint

– or, until July 16, 2011, to timely name and serve the Doe Defendant. That deadline has long since

passed, and as explained above, Plaintiff has failed to present any reasonable justification for his

failure to identify and serve the Doe Defendant. Therefore, we recommend that Defendants' Motion

---

[9] Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L.R. 4.1(b)

for Summary Judgment be **GRANTED** as to this claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 52) be **GRANTED** as to Plaintiff's deliberate indifference claim against Defendant Johnson, and **DENIED** as to Plaintiff's conditions of confinement claim against Defendant Johnson; and it is further

**RECOMMENDED**, that Defendants Doe and Wright be **DISMISSED** from this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

Date: August 29, 2013
Albany, New York

Randolph F. Treece
U.S. Magistrate Judge